## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

**RUTHERFORD CALVIN BRYSON, JR.,**

        **Plaintiff,**

**v.**

**FIDELITY INFORMATION SERVICES,**
**INC.; FIDELITY NATIONAL FINANCIAL,**
**INC.; FIDELITY NATIONAL**
**MANAGEMENT SERVICES, LLC; FIS**
**MANAGEMENT SERVICES, LLC;**
**FRANK R. SANCHEZ; GREG BYERLY;**
**and FELIX MITCHELL,**

        **Defendants.**

_____

**Civil Action No. 3:07-cv-00156**

**AMENDED COMPLAINT**
**[JURY TRIAL DEMANDED]**

)
)
)
)
)
)
)
)
)
)
)
)

     Plaintiff Rutherford Calvin Bryson, Jr., complaining of Defendants Fidelity Information Services, Inc., Fidelity National Financial, Inc., Fidelity National Management Services, LLC, FIS Management Services, LLC, Frank R. Sanchez, Greg Byerly, and Felix Mitchell, states:

### PARTIES, JURISDICTION AND VENUE

     1.    Plaintiff Rutherford Calvin Bryson, Jr. ("Bryson"), is an adult resident of Charlotte, Mecklenburg County, North Carolina.

     2.    Upon information and belief, Defendant Fidelity Information Services, Inc. ("FIS"), is an Arkansas corporation having its principal office in Jacksonville, Florida. FIS's agent for service of process in North Carolina is CT Corporation System, 225 Hillsborough Street, Raleigh, North Carolina 27603.

     3.    Upon information and belief, Defendant Fidelity National Financial, Inc. ("FNF"), is a Delaware corporation having its principal office in Jacksonville, Florida.

As is more fully set forth below, FNF has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

4.      Upon information and belief, Defendant Fidelity National Management Services, LLC ("FNMS"), is a Delaware limited liability company having it principal office in Jacksonville, Florida.  As is more fully set forth below, FNMS has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

5.      Upon information and belief, Defendant FIS Management Services, LLC ("FISMS"), is a Delaware limited liability company having its principal office in Jacksonville, Florida.  As is more fully set forth below, FISMS has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

6.      FIS employed Bryson as a salesperson from approximately June 2003 until it terminated his employment on March 2, 2006.

7.      Company letterhead and other documents identify "Fidelity Information Services" as "A Division of Fidelity National Financial."  The W-2 Bryson received for 2004, as well as his paychecks through part of 2005, identified FNMS as Bryson's employer.  The W-2s Bryson received for 2005 and 2006 identified FISMS as his employer.  Accordingly, upon information and belief, FNF and FNMS employed Bryson jointly with FIS from June 2003 until some time in 2005, and FNF and FISMS employed Bryson jointly with FIS from some time in 2005 until they terminated his employment on

March 2, 2006.  Hereafter, FIS, FNF, FNMS and FISMS are referred to collectively as "Fidelity."

8.       For the entire duration of his employment, Bryson was a North Carolina resident and Fidelity employed Bryson in North Carolina and sent wages and all material related to his employment to Bryson in North Carolina.

9.       Upon information and belief, Defendant Frank R. Sanchez ("Sanchez") is a resident of Florida.  As is more fully set forth below, Sanchez has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

10.      Upon information and belief, Defendant Greg Byerly ("Byerly") is a resident of Florida.  As is more fully set forth below, Byerly has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

11.      Upon information and belief, Defendant Felix Mitchell ("Mitchell") is a resident of Florida.  As is more fully set forth below, Mitchell has had significant contacts with the State of North Carolina, and in particular has had significant contacts with North Carolina from which Bryson's claims arise.

12.      Sanchez, Mitchell and Byerly were each at all relevant times an officer or managing agent of Fidelity and/or an affiliated company or affiliated companies and at all relevant times acted directly or indirectly in the interest of Fidelity in relation to Bryson.  In particular, Sanchez, Mitchell and Byerly acted directly or indirectly in the interest of Fidelity with respect to Fidelity's failure and refusal to pay Bryson earned wages that he seeks to recover in this lawsuit.

13.     For at least the duration of Bryson's employment by Fidelity, Sanchez, Mitchell and Byerly placed innumerable telephone calls, and sent numerous e-mails, memoranda, letters and/or other communications and material to Bryson and others, including Fidelity customers and would-be customers, in North Carolina.  Sanchez and Byerly traveled to North Carolina.  Sanchez, Mitchell and Byerly's contacts with North Carolina relate directly to Fidelity's business in North Carolina; and in particular to business Bryson worked to develop, and from which Bryson's claims arise.  Sanchez, Mitchell and Byerly's actions in the interest of Fidelity in relation to Bryson were directed toward Bryson in North Carolina and injured Bryson in North Carolina.

14.     This North Carolina Court has jurisdiction over each non-resident defendant by virtue of each such defendant's contacts with the State of North Carolina, which include significant activities in (or directed toward Bryson in) North Carolina from which Bryson's claims arise.

15.     This Court is the proper venue for this lawsuit.

16.     This action by Bryson is to recover unpaid wages, liquidated damages and expenses, including attorney's fees, for violations of the North Carolina Wage and Hour Act, to recover compensatory and punitive damages for Fidelity's wrongful termination of his employment in contravention of North Carolina public policy, and to recover back pay, liquidated damages, front pay and expenses, including attorney's fees, for Fidelity's violation of the Age Discrimination in Employment Act (ADEA).

## FACTS

17.     Fidelity is in the business of providing financial processing and information technology services to large financial institutions, among others.

18.     Fidelity hired and employed Bryson to sell these services.

19.     In addition to a base salary, Bryson earned commissions in accordance with a written Commission Plan and Fidelity's established pattern and practice of calculating and paying commissions.  A copy of Fidelity's 2005 Sales Commission Plan applicable to Bryson is attached as **Exhibit A** and is incorporated as if fully set forth.  Fidelity altered the Plan for 2006.  A copy of Fidelity's 2006 Sales Team Commission Plan applicable to Bryson is attached as **Exhibit B** and is incorporated as if fully set forth.

20.     According to the written Commission Plans and established pattern and practice, Fidelity salespeople, including Bryson, earned commissions based upon specified percentages of sales revenue and profit for the sale (minus cost of sales, i.e., commissions to be paid).

### Bank of America Military Bank

23.     In mid-2003, shortly after he was hired by Fidelity, Bryson began sales efforts to obtain significant new business from Bank of America Military Bank ("BOA Military").

24.     In January 2005, BOA and Fidelity entered into a formal Memorandum of Understanding (MOU).  Based upon that MOU, Fidelity began implementation of outsourcing services for BOA Military in or about February 2005.

25.     Early in 2005, BOA Military and Fidelity agreed to split the overall outsourcing contract into four (4) Statements of Works, which became known as SOW1, SOW2, SOW3 and SOW4.

26.     On or about June 24, 2005, BOA Military signed the final agreement for SOW1.

27.     No later than 90 days from that date, Bryson was entitled under the 2005 Commission Plan to payment of earned commissions for SOW1 totaling approximately (and not less than) $79,631.

28.     Fidelity did not at any time pay Bryson any commission for SOW1.

29.     By November 2005, Bryson's sales efforts for the remainder of the BOA Military deal (SOW2, SOW3 and SOW4) were complete, with BOA Military having approved and accepted the deal as approved by a Fidelity Value Review Board (VRB). Finalization of the contract was turned over to the companies' respective legal departments where it remained for the next four months.

30.     Fidelity fired Bryson effective March 2, 2006.  BOA Military signed the final contract for the deal later the same month.

31.     For the entire BOA Military deal, Bryson is entitled under the 2006 Commission Plan to payment of earned commissions totaling approximately (and not less than) $850,591.

32.     Fidelity contends that Bryson's commissions for the BOA Military deal should be calculated using the 2005 Commission Plan.  Under the 2005 Commission

Plan, Bryson is entitled to payment of earned commissions for the BOA Military deal totaling approximately (and not less than) $428,647.

33.     Fidelity contends that Bryson's earned commissions under the 2005 Commission Plan for the BOA Military deal total $197,167.77.  That Bryson earned at least that amount for the BOA Military deal is undisputed.  Fidelity has nevertheless refused and failed, and continues to refuse and fail to pay this undisputed amount to Bryson unless he signs a General Release in favor of Fidelity.

34.     Bryson worked for nearly three years to bring the very lucrative BOA Military deal to Fidelity.  Fidelity fired Bryson without cause shortly before the final contract was signed and without justification has failed and refused, and continues to fail and refuse to pay Bryson any portion of his earned commissions for the deal.

Compass Bank

35.     In early 2005, Fidelity assigned Bryson to lead the sales effort to obtain renewal business from Compass Bank.

36.     In December 2006, Fidelity held a VRB and approved a proposal to Compass Bank.

37.     Compass Bank approved the proposal with the exception of a portion for professional services.

38.     Compass Bank signed the final renewal contract (professional services excluded) on or about February 28, 2006.  Fidelity fired Bryson effective March 2, 2006.

39.     For the Compass Bank deal, Bryson is entitled under the 2006 Commission Plan to payment of earned commissions totaling approximately (and not less than) $94,148.

40.     Fidelity contends that Bryson's commission for the Compass Bank deal should be calculated using the 2005 Commission Plan. Under the 2005 Commission Plan, Bryson is entitled to payment of earned commissions for the Compass Bank deal totaling approximately (and not less than) $139,744.

41.     Fidelity contends that Bryson's earned commissions under the 2005 Commission Plan for the Compass Bank deal total $85,552.33. That Bryson earned at least that amount for the Compass Bank deal is undisputed. Fidelity has nevertheless refused and failed, and continues to refuse and fail to pay this undisputed amount to Bryson unless he signs a General Release in favor of Fidelity.

42.     Fidelity fired Bryson without cause two days after the Compass Bank deal was signed and without justification has failed and refused, and continues to fail and refuse to pay Bryson any portion of his earned commissions for the deal.

Ameriprise Financial

43.     In early 2005, Fidelity assigned Bryson to lead the sales effort to obtain renewal business from American Express.

44.     Shortly afterward, American Express notified Fidelity that it planned to spin off the segment of its business that used the Fidelity platform and that the new company would be Ameriprise Financial ("Ameriprise").

45.     After significant effort by Bryson in the second and third quarters of 2005, American Express notified Fidelity that it would continue to use Fidelity, but that Ameriprise would be the customer and they wanted significant pricing concessions.

46.     Negotiations continued into the fourth quarter of 2005, and on November 16, 2005, Ameriprise accepted a proposal that Fidelity had approved through a VRB meeting the previous day.

47.     Fidelity delivered to Ameriprise a letter of understanding dated December 22, 2005, to memorialize the deal.   Ameriprise agreed that the letter reflected their agreement and that the letter would be used as the basis for the final contract.

48.     At this time, the American Express/Ameriprise transition was still pending, such that preparation of the final contract between Fidelity and Ameriprise would at that time have been more complicated and difficult.  In addition, Fidelity's then current pricing was more lucrative for Fidelity than the new Ameriprise contract and was to stay in place until the new Ameriprise contract was signed.  For these reasons, Fidelity was in no hurry to complete the final contract and allowed the process to draw out for several months.  Ameriprise signed the final contract on September 15, 2006.

49.     The final Ameriprise contract is a reflection of the letter of understanding Fidelity prepared and submitted to Ameriprise in or about December 2005.

50.     In February 2006, Fidelity asked Bryson to agree that if the final contract for the Ameriprise deal was signed within 60 days from March 1, 2006, he would get 100% of his commission; if it was signed within 90 days of March 1, 2006, he would get only 50% of his commission; and if it was signed more than 90 days from March 1, 2006, he would get zero.  Bryson did not agree.  Fidelity, as Bryson knew, had no incentive to

move forward quickly to finalize the contract and could control when the contract would be finalized and signed.

51. For the Ameriprise deal, Bryson is entitled under the 2006 Commission Plan to payment of earned commissions totaling approximately (and not less than) $424,481. Alternatively, under the 2005 Commission Plan, Bryson is entitled to payment of earned commissions for the Ameriprise deal totaling approximately (and not less than) $435,314.

52. After Bryson's sales efforts culminated in the letter of understanding that Ameriprise approved, Fidelity fired Bryson without cause and without justification has failed and refused, and continues to fail and refuse to pay Bryson any portion of his earned commissions for the deal.

<u>Wrongful Termination</u>

53. Upon information and belief, Fidelity fired Bryson because of his age (63 when Fidelity fired him) and in an effort to avoid paying him the substantial commissions to which he is entitled.

54. At the time Fidelity fired him, Bryson worked under the supervision of Byerly. In addition to Bryson, in 2005 and through April 2006, Fidelity fired the following salespeople, at least three of whom were also under the supervision of Byerly: Tom Behr (age 60); Art Mitchell (age 63); Bill Morris (age 62) and Mike Saint (age 56).

55. When Byerly told Bryson he would be fired, Byerly said he was being fired because his "job has been eliminated." Upon information and belief, in response to Bryson's Equal Employment Opportunity Commission (EEOC) Charge of age

discrimination, Fidelity told the EEOC that it fired Bryson because of poor performance. Both of Fidelity's supposed reasons for firing Bryson are false.

## COUNT I
### North Carolina Wage and Hour Act
(All Defendants)

56.     Bryson incorporates the preceding paragraphs as if fully set forth.

57.     In violation of the North Carolina Wage and Hour Act, Defendants have refused and failed, and continue to refuse and fail to pay Bryson the substantial earned commissions to which he is entitled for the BOA Military, Compass Bank and Ameriprise deals, as set forth above.

58.     As a direct and proximate result of Defendants' unlawful conduct in violation of the North Carolina Wage and Hour Act, Bryson is entitled to recover damages from Defendants, jointly and severally, including, but not limited to, all earned and past due commissions.

59.     Furthermore, under the North Carolina Wage and Hour Act, Bryson is entitled to the legal rate of interest from the date each payment first came due; to liquidated (double) damages in an amount equal to all unpaid and past due wages; and to reimbursement for all expenses of this lawsuit, including, but not limited to, all costs and attorney's fees.

## COUNT II
### Wrongful Termination
(Fidelity only)

60.     Bryson incorporates the preceding paragraphs as if fully set forth.

61.     In contravention of the public policy of North Carolina, explicitly set forth in the North Carolina Equal Employment Practices Act and North Carolina Wage and

Hour Act, Fidelity fired Bryson because of his age and in an attempt to avoid paying him substantial earned commissions.

62.     Fidelity, by Byerly, wrongfully discharged Bryson maliciously, willfully and wantonly.

63.     As a direct and proximate result of Fidelity's wrongful discharge, Bryson has suffered damages, including, but not limited to, lost wages and benefits.

64.     Bryson is entitled to recover punitive damages from Fidelity in an amount to be determined by a jury, but sufficient in amount to punish and deter them and others similarly situated from engaging in such misconduct in the future.

## COUNT III
### Age Discrimination in Employment
(Fidelity)

65.     Bryson incorporates the preceding paragraphs as if fully set forth.

66.     Fidelity has at all times since its formation engaged in an industry affecting interstate commerce.

67.     Fidelity, and FIS specifically, had twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in 2006 and 2005.

68.     On July 7, 2006, Bryson filed a Charge of Discrimination against FIS with the Equal Employment Opportunity Commission (EEOC), charging that FIS had subjected him to discrimination because of his age (63) in violation of the Age Discrimination in Employment Act of 1967 (ADEA) (Charge No. 430-2006-03985).

69.     After efforts at conciliation failed, the EEOC on April 3, 2007, mailed a Dismissal and Notice of Rights to Bryson allowing Bryson to file a lawsuit against FIS under the ADEA.

70.     Bryson was qualified for his job with Fidelity and met Fidelity's legitimate expectations.

71.     Bryson, moreover, was qualified for other positions that Fidelity had open at the time Fidelity fired Bryson. Bryson asked Fidelity to consider him for other available positions for which he was qualified. Fidelity did not respond.

72.     Fidelity fired Bryson despite his qualifications and good performance.

73.     Fidelity replaced Bryson and other terminated sales people with persons who were substantially younger.

74.     Fidelity fired Bryson because of his age in violation of the ADEA, 29 U.S.C. § 621, et. seq.

75.     As a direct and proximate result of Fidelity's unlawful conduct in violation of the ADEA, Bryson is entitled to recover damages from Fidelity, including without limitation back pay and front pay.

76.     Furthermore, under the ADEA, Bryson is entitled to interest on all back pay, liquidated (double) damages in an amount equal to all back pay; and to reimbursement for all expenses of this lawsuit, including, but not limited to, all costs and attorney's fees.

**WHEREFORE,** Plaintiff Rutherford Calvin Bryson, Jr., respectfully prays the Court to:

1. Enter a judgment that Plaintiff have and recover from Defendants, jointly and severally, the amount of damages proven at trial caused by Defendants' violations of the North Carolina Wage and Hour Act, together with liquidated damages in an equal amount.

2. Enter a judgment that Plaintiff have and recover from each Fidelity entity, jointly and severally, the amount of damages proven at trial caused by its wrongful termination of Bryson's employment.

Enter a judgment that Plaintiff have and recover from each Fidelity entity punitive damages in an amount sufficient to deter it and others similarly situated from engaging in such misconduct in the future.

3. Enter a judgment that Plaintiff have and recover from Fidelity the amount of damages proven at trial caused by Fidelity's violations of the ADEA, together with liquidated damages in an amount equal to all back pay.

4. Enter a judgment that Plaintiff have and recover from Defendants, jointly and severally, the costs of this action, including attorney's fees, pursuant to the North Carolina Wage and Hour Act, ADEA and other applicable law.

5. Enter a judgment that Plaintiff have and recover interest on the above damages as allowed by law.

6.     Enter a judgment that Plaintiff have and recover such other and further relief as this Court may deem just and proper.

**Plaintiff demands trial by jury on all issues so triable.**

Respectfully submitted this 16th day of April, 2007.

s/ Jared E. Gardner

William K. Diehl, Jr. (Bar No. 1187)
   Email:  bdiehl@jmdlaw.com
Jared E. Gardner (Bar No. 28275)
   Email:  jgardner@jmdlaw.com
James, McElroy & Diehl, P.A.
600 S. College St., Suite 3000
Charlotte, North Carolina  28202
Telephone: (704) 372-9870
Facsimile:   (704) 333-5508

*Attorneys for Plaintiff Rutherford Calvin Bryson, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing **AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties, as follows:

Benjamin Robert Holland (bholland@mcguirewoods.com)
Kimberly Quade Cacheris (kcacheris@mcguirewoods.com)
Marisa B. Nye (mnye@mcguirewoods.com)
McGuireWoods, LLP
*Attorneys for Defendants*

This 16th day of April, 2007.

s/ Jared E. Gardner
William K. Diehl, Jr. (Bar No. 1187)
Email: bdiehl@jmdlaw.com
Jared E. Gardner (Bar No. 28275)
Email: jgardner@jmdlaw.com
James, McElroy & Diehl, P.A.
600 S. College St., Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508

*Attorneys for Plaintiff Rutherford Calvin Bryson, Jr.*